## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Louis Bellamy, as Trustee for the
next of kin of Lucas John Bellamy,
Deceased,

        Plaintiff,

        vs.

Roselene M. Omweri in her individual capacity,
Kay P. Willis in her individual capacity,
Michelle D. Diaz in her individual capacity,
Lucas Weatherspoon in his individual capacity,
Hennepin Healthcare System, Inc., and
Hennepin County, Minnesota,

        Defendants.

Case No.

**Complaint**

**Jury Trial Demanded**

For his Complaint, Plaintiff Louis Bellamy as trustee for the next of kin of decedent Lucas John Bellamy ("Lucas"), by and through his attorneys, states and alleges upon knowledge, information, and belief as follows:

### Introduction

1.      Lucas spent the last day of his life detained at the Hennepin County Adult Detention Center (the "Jail"), desperately begging nurses and jail guards to see a doctor. His pleas went ignored even though a Hennepin Healthcare provider had ordered that Lucas "[r]eturn to the ED [Emergency Department] for any new concerning symptoms." Lucas could not return himself to the Emergency Department because he was in Hennepin County's custody. Instead of receiving the medical treatment that was ordered

and Lucas desperately needed, Hennepin Healthcare and County employees left Lucas to crawl around on the jail floor like he was subhuman, like he was an animal, while he slowly and painfully died from the effects of a hole in his intestine.  Lucas could have been easily saved with proper treatment.  Instead, he endured a real-life nightmare and died on July 21, 2022.

2.     More detainees have died since 2015 at the Jail than at any other detention center in Minnesota over the same span of time. Hennepin County and Hennepin Healthcare employees repeatedly fail to properly monitor detainees in their care.  The County has a longstanding custom of failing to conduct timely and adequate well-being checks and lying about well-being checks without repercussion.  The County and its nurses staffed by Hennepin Healthcare have a custom and practice of ignoring serious medical needs and letting detainees suffer up until the point of and even death.  Due to these and other organizational and individual failures described herein, Lucas died a horrific death.  Defendants must be held accountable for Lucas's senseless and untimely death.  The County and Hennepin Healthcare must compelled to undergo training and make meaningful policy changes because they have consistently failed to make the needed changes on their own accord.

3.     This is an action for damages pursuant to 42 U.S.C. § 1983 against the Defendants due to their deliberate indifference to Lucas's serious medical needs with supplemental state law wrongful death claims.

## Parties

4.      Lucas was at all relevant times a 41-year-old man residing in Minnesota. Like millions of Americans, Lucas suffered from drug addiction.  Lucas was much more than his drug addiction.  He was a father, a son, a brother, an actor, and a loved member of his community.

5.      Plaintiff Louis Bellamy ("Plaintiff") is Lucas' father and was appointed as the trustee for Lucas' next of kin on January 6, 2023, by the Honorable Kristin A. Siegesmund in Case No. 27-cv-22-18265 (Henn. Dist. Ct.).  Plaintiff is the founder of the nationally renowned Penumbra Theatre in Saint Paul, Minnesota.

6.      Defendant Hennepin County, Minnesota (the "County") is a county within and a political subdivision of the State of Minnesota.  It is a body politic and corporate subject to suit pursuant to Minn. Stat. § 373.01 *et seq.*  The County is also defined as a municipality for purposes of tort liability pursuant to Minn. Stat. § 466.01 *et seq.* Hennepin County owns and operates the Hennepin County Sheriff's Office ("HCSO"), the Adult Detention Center ("ADC"), and Defendant Hennepin Healthcare System, Inc.

7.      Hennepin Healthcare System, Inc. ("Hennepin Healthcare") is a Minnesota public subsidiary corporation authorized by statute, Minn. Stat. § 383B.901 *et seq.*, and located in Hennepin County, Minnesota.  It does business as Hennepin Healthcare and Hennepin County Medical Center ("HCMC").

8.      Hennepin Healthcare employs medical personnel and provides the services of those personnel to the Jail for the purposes of providing medical care to the Jail detainees.

9.     All acts and omissions of Hennepin Healthcare are considered to be the acts and omissions of the County.

10.     Employees of the County and Hennepin Healthcare both work under color of state law for purposes of 42 U.S.C. § 1983.

11.     Hennepin Healthcare and the County, to the extent considered distinguishable entities, engaged in a joint venture and worked in concert with one another to provide medical care to the inmates and detainees[1] at the Jail.

12.     At all relevant times, the County owed Lucas and other inmates at the Jail a nondelegable duty of care to ensure that they received legally sufficient medical care.

13.     At all relevant times, Nurse Roselene Omweri ("Omweri") resided in Minnesota, was employed by Hennepin Healthcare, and acted under color of state law. She is sued in her individual capacity.

14.     At all relevant times, Nurse Kay Willis ("Willis") resided in Minnesota, was employed by Hennepin Healthcare, and acted under color of state law. She is sued in her individual capacity.

15.     At all relevant times, Nurse Michelle Diaz ("Diaz") resided in Minnesota, was employed by Hennepin Healthcare, and acted under color of state law. She is sued in her individual capacity.

---

[1] The terms "inmate" and "detainee" shall be used interchangeably and without distinction for purposes of this Complaint.

16.     At all relevant times, Deputy Lucas Weatherspoon ("Weatherspoon") was a deputy in the HCSO, employed by the County, and acted under color of state law.  He is sued in his individual capacity.

## Factual Background

### I.     The County has a history of deliberate indifference at the Jail

17.     Since 2015, more detainees have died at the Jail than at any other detention center in Minnesota over the same span of time.

18.     Since 2015, there have been approximately 15 deaths between the Jail and other County correctional facilities.

19.     There were at least four deaths at the Jail in 2022.

20.     There were at least four deaths at the Jail in 2023.

21.     Many of the deaths at the Jail have been a result of a failure to conduct timely and/or adequate well-being checks on inmates.

22.     Minnesota state law has long required that a county jail's staff conduct staggered well-being checks of each inmate every 30 minutes.  *See* Minn. R. 2911.5000, subp. 5 (2013).

23.     The County, following a rash of inmate deaths at its facilities, had a policy at the Jail in 2022 that required standard well-being checks to be conducted every 25 minutes.

24.     Well-being checks must be completed with such sufficiency and diligence that the jail guard conducting the check confirms, among other things, that an inmate is alive and not in medical distress.

5

25.     Well-being checks must be completed slowly and deliberately enough to confirm that the inmate is alive and well, not just that there is a human body in the cell.

26.     Staff conducting well-being checks must observe signs of life such as movement or the rise-and-fall of one's chest (indicative of breathing).

27.     Minnesota state law (in addition to Jail Policy) has also long required that more frequent observation for high risk inmates: "**More frequent observation is required for those inmates of a special need classification who may be harmful to themselves. Examples of inmates of a special need classification include those classified as potentially suicidal, or as mentally ill, or those experiencing withdrawal from drugs or alcohol.**" *See* Minn. R. 2911.5000, subp. 5 (i.e., a "special watch").

28.     The County has failed to conduct timely and/or thorough well-being checks despite repeated notice.

29.     In biannual inspection reports conducted by the Minnesota Department of Corrections ("DOC") in both 2016 and 2018, the DOC facility inspector found that the County's well-being checks were out of compliance with Rule 2911.5000, subpart 5.

30.     In 2016, Senior Detention Facility Inspector Greg Croucher ("Croucher") found that "[t]he documentation of health and welfare checks is inconsistent…"

31.     In 2018, Croucher similarly found that: "The majority of checks are done through the pipe chases and not in the housing units.  Due to incidents that occurred during this inspection cycle, this standard was found to be out of compliance.  Staff members were not always completing health and welfare checks appropriately. Some

housing units were entered but staff did not walk around the unit fully.  Facility

Administration is aware of this issue and has taken steps to address it."

32.     In June 2017, an inmate with the initials "R.K." hung himself at the Jail and

died from suicide.  The DOC found that well-being checks were not properly conducted

on R.K.  The lack of proper well-being checks on R.K. caused, at least in part, R.K.'s

death.

33.     In conducting a DOC review of R.K.'s death, Croucher found that "[t]he

majority of the health and welfare checks observed were not completed appropriately.

The correctional officer doesn't look into each cell and at times is looking down at the

floor, doesn't turn his head at all towards the cells or goes around the dayroom tables.

Consequently, most of the health and welfare checks leading up to the discovery of

[R.K.] are out of compliance with both facility policy and the Chapter 2911 standards.

Additionally, the correctional officer is observed at a pace that is too fast. Signs of life

such as: movement, rise and fall of chest or other signs of life would be difficult to

determine at such a quick pace."

34.     Upon information and belief, in July 2017 an inmate with the initials

"B.B." was found dead in his cell at the Hennepin County Workhouse.  The DOC found

that well-being checks were not properly conducted on B.B.  The lack of proper well-

being checks on B.B. caused, at least in part, B.B.'s death.

35.     In January 2018, an inmate with the initials "K.D." died from a drug

overdose.  The DOC found that well-being checks were not properly conducted on K.D.

The lack of proper and timely medical attention and well-being checks on K.D. caused, at least in part, K.D.'s death.

36.    In August 2018, an inmate with the initials "M.G." hung himself at the Jail and died from suicide.  The DOC found that well-being checks were either done late or not at all, and that Jail staff were logging checks that did not occur.  The lack of proper well-being checks on M.G. caused, at least in part, M.G.'s death.

37.    In September 2018, an inmate with the initials "T.K." hung himself at the Jail and died from suicide.  The DOC found that wellbeing checks were either done late or not at all, and that Jail staff were logging checks that did not occur.  The lack of proper well-being checks on T.K. caused, at least in part, T.K.'s death.

38.    Despite these known failures, yet another inmate with the initials "N.P." died by suicide at the Jail on September 11, 2020, as a result of failures to attend to his serious medical needs and to conduct timely well-being checks.

39.    Despite N.P.'s September 11 suicide only twelve days prior, the biannual DOC inspection conducted on September 23, 2020, **still reflected** a failure of Jail staff to conduct proper well-being checks.

40.    In the 2020 report, Senior Detention Facility Inspector Sarah Johnson ("Johnson") found a violation of Rule 2911.0300 for the County's failure to correct deficiencies, writing that "[t]his is written notice of a level one sanction to Hennepin County Adult Detention Center.  Due to well-being checks being out of compliance for two inspection cycles, the Department of Corrections is issuing written compliance orders for rule standard 2911.5000 Subpart 5 Well-being."

41.     Johnson further found that "[t]here were multiple areas of concern for well-being checks.  Logs show well-being checks are being completed exactly every 30 minutes apart and not staggered as required.  Video review verified staff members were not always completing well-being checks appropriately.  When staff were completing well-being checks in units E and F, they were not always going into the linear day spaces to personally observe inmates, they are observing them from the door.  A proper well-being check cannot be done standing at the doorway of units.  It was observed that during sleeping hours some staff completed well-being checks at a pace too fast to confirm signs of life.  I was unable to verify proper well-being checks during the sleeping hours for the City Hall building due to poor camera quality.  This issue should be rectified with the new camera system that is planned in 2021."

42.     Johnson ordered the following corrective action: "[t]he Officials of Hennepin County ADC will need to submit corrective action to the Department of Corrections to ensure checks are being completed appropriately. This is a repeat concern for this facility. Staff need to stagger their time and to enter the units fully to properly view inmates. Staff members need to slow down and be more deliberate at each cell to ensure the well-being of each inmate . . ."

43.     Even today, after the death of Lucas and others, the County was still ordered to take corrective action by the Minnesota Department of Corrections ("DOC") for its failures associated with well-being checks in the Biannual Inspection for the period that began on October 1, 2022 and continues through September 30, 2024, with inspections occurring between September 7, 2022 and January 24, 2023.

44.    Even after this inspection, the County still failed to meets its well-being checks and other obligations to ensure for the safety and welfare of detainees at the Jail. On February 17, 2023, a detainee with the initials "R.W." committed suicide at the Jail. The DOC found that multiple well-being checks were missed and that checks were **fraudulently** recorded, as detailed in a September 7, 2023 letter from the DOC to Sheriff Dawanna Witt: "Additionally, the well-being check that was not conducted but documented as such is a very serious violation. A repeat of fraudulent documentation around well-being checks will result in further corrective action."

## II.    Lucas was ordered to return to the Emergency Department for ANY new concerning symptoms.

45.    Lucas was arrested in the early morning hours of July 18, 2022.

46.    He was brought to the Hennepin County Jail where he disclosed at intake that he had ingested a bag of drugs.

47.    Lucas presented to HCMC's Emergency Department at approximately 5:53 a.m.

48.    Hennepin Healthcare, the same entity which provides the healthcare at the Jail, provides the medical care at HCMC.

49.    Lucas was sedated upon his arrival at HCMC.

50.    After monitoring Lucas for several hours, the providers at HCMC determined that Lucas "[a]ppeared clinically stable on presentation, vitals only concerning for mild tachycardia."

51. Physician's Assistant Cameron Svihla ("PA-C Svihla") charted that Lucas "was stable for discharge back to PD custody at this time as he will continued [sic] to be monitored at jail and has **very low risk** for any toxic effects from opioid medications at this point."  (emphasis added).

52. PA-C Svihla also charted that Lucas should "[r]eturn to the ED for any new concerning symptoms."

53. Lucas was discharged back to the Jail at or about 9:00 a.m.

## III. Lucas develops new and concerning symptoms but no one from Hennepin Healthcare or the County returns him to the Emergency Department.

54. Nurse Kathryn Piha ("Piha") completed Lucas's intake screening upon his return to the Jail.

55. Lucas disclosed his recent drug usage and history of drug addiction.

56. Piha charted that Eric Hazen, M.D. ("Dr. Hazen") prescribed Vistaril, Zofran, and Imodium to treat Lucas' anticipated drug withdrawals.  These are all mild medications and are not controlled substances.  While Lucas did receive these mild medications, he never received more substantial withdrawal medication during his detention at the Jail.

57. Despite prescribing Lucas these medications, there is no evidence from the medical records that Dr. Hazen ever personally met with or evaluated Lucas.

58. At 6:22 p.m., Nurse Claire Riesgraf charted that Lucas requested Narcan at intake and met the criteria for Narcan distribution under jail policy, but the Narcan was not dispensed.

59.    Hennepin Healthcare staff determined that absent the development of further withdrawal symptoms, no further withdrawal medication would be prescribed.

60.    Shortly after midnight on July 20, 2022, Lucas became ill and started vomiting in his general population bunk, as depicted below:



61.    Lucas was then moved from general population into a protective custody unit with one inmate per cell.

62.    Jail staff did not record why Lucas's cell was moved, but Jail staff later recorded that the move was "possibly due to bad [withdrawals]."

63.    There is no evidence that Lucas ever ate food again after his move to protective custody and prior to his death.

64.    It also became known to Jail staff that Lucas was declining his meals and at times other inmates were taking his food because he was not eating it.

65.    Lucas also declined taking the one-hour time out of his cell each time it was offered.

66.    On the evening of July 20, 2022, Lucas's condition worsened in a drastic and obvious fashion.

**A.    Nurse Willis's deliberate indifference**

67.    Defendant Nurse Kay Willis ("Nurse Willis") and Jail guard Taylor (first name unknown) meet with Lucas at approximately 9:40 p.m.

68.    Nurse Willis knew from the Hennepin Healthcare records that Lucas was to return to the Emergency Department if he developed new or concerning symptoms.

69.    Nurse Willis knew from the Hennepin Healthcare records that Lucas revealed at his initial intake that he had swallowed a bag of drugs.

70.    When they arrive, Nurse Willis charts that Lucas is complaining of stomach pain and was "sitting on the floor and mourning when this writer arrived."[2]

71.    Lucas was in such severe and obvious pain that it took him 45 seconds to crawl out of his cell on his hands and knees after Taylor opened the cell door.

72.    Lucas crawling towards Nurse Willis and Taylor is depicted in the images below:

---

[2] "[M]ourning" is correctly identified as the word charted by Nurse Willis.





73.    Lucas was directed to sit at the table.

74.    Lucas was in so much pain that he could not even reach the table without collapsing face first onto the ground as depicted below:



75.    Neither Nurse Willis nor Taylor ever assisted Lucas to help him stand up.

76.    Nurse Willis further charted that Lucas informed her that he was not able to eat, and he also said, "I need to go to the hospital, I need IV liquid."

77.    Nurse Willis made no mention of Lucas's stomach pain in her charted note of this interaction, but Taylor did: "[Lucas] requested to go to the hospital do [sic] to stomach pains."

78.    Nurse Willis similarly did not chart that Lucas had to crawl from his cell to the table for the examination, that he had laid face down on the floor in a ball, or that he

could not sit upright for a prolonged period once he finally reached the table, as depicted below:



79.    Instead, Nurse Willis simply charted that Lucas was "[a]ble to sit up and sit still."

80.    Nurse Willis never conducted a physical examination of Lucas's abdomen, nor did any of the other Defendant Nurses.

81.    Taylor noted that Nurse Willis informed Lucas that she "was not sending [him] to the hospital tonight." Nurse Willis also did not write this in her own note.

82.    Nurse Willis instructed Lucas to contact Jail medical staff if his symptoms worsened.

83.    Despite Lucas developing these new and concerning symptoms, Nurse Willis **ignored** the order that Lucas be returned to the Emergency Department.

84.     Lucas's symptoms were caused by a perforated bowel, which can—and in this case did—cause death.

85.     Plaintiff anticipates Nurse Willis will argue that it was not necessary to send Lucas to the hospital because she charted that Lucas's vitals were within normal limits.

86.     However, during the early presentation of a perforated bowel, a patient's vital signs may be entirely normal.

87.     Overt abdominal pain is also not a typical symptom of opioid withdrawal.

88.     Therefore, when a patient has overt abdominal pain, the standard of care requires the provider to conduct a physical examination of the abdomen and consider other diagnoses, as the overt abdominal pain experienced by Lucas could be indicative of several life-threatening injuries and/or illnesses that must be investigated.

89.     One of the most basic, standard, and important vital signs is a person's body temperature.

90.     Infections such as peritonitis and sepsis arise from perforated bowels and often reveal themselves through fever.

91.     Neither Nurse Willis, nor any other Hennepin Healthcare provider at the Jail, **ever** took Lucas's temperature despite Nurse Willis and others claiming that Lucas had normal vital signs.

92.     Nurse Willis returned to re-check Lucas's blood pressure at approximately 10:06 p.m., reflecting that she was concerned about his earlier blood pressure of 134/76, which was approaching hypertension.

93.    She charted that Lucas "started mourning when asked to stand up."

94.    Indeed, Lucas was too weak to stand on his own to have his blood pressure measured, but Nurse Willis made no mention of this in her notes. Images of Lucas struggling to stand during this interaction are reflected below:





95.     Lucas's blood pressure this time read 136/53, and Willis charted that she would not "order clonidine at this time."  Clonidine is an antihypertensive drug that lowers blood pressure.

96.     Once again, Nurse Willis refused to send Lucas to the Emergency Department for his new concerning symptoms as ordered.

97.     Nurse Willis failed to even put Lucas on a special watch to ensure that he was subjected to more frequent well-being checks.

**B.     Nurse Diaz's deliberate indifference.**

98.     At approximately 1:30 a.m. on July 21, 2022, Lucas used the intercom to contact guard Morales-Pliego (first name unknown).

99.     Morales-Pliego wrote in Lucas's inmate history that Lucas:

commuicated . . . via intercom that he was having  really bad stomachache he screamed "**help me, help me**" i went to check on him and hi was lying on the floor **fetus position**, I asked how he was feeling and [Lucas] stated "**my stomach hurts really bad, help me**" i called the med room…

(emphasis added).[3]

100.    Nurse Diaz then joined Morales-Pliego on a visit to Lucas' cell.

101.    Nurse Diaz knew from the Hennepin Healthcare records that Lucas was to return to the Emergency Department if he developed new symptoms.

102.    Nurse Diaz knew from the Hennepin Healthcare records that Lucas revealed at his initial intake that he swallowed a bag of drugs.

103.    Like Morales-Pliego, Nurse Diaz charted that Lucas was in extreme pain: "Pt [i.e., Lucas] was kneeling while his head is on the floor and crying when checked.  Pt verbalized '**I need to go the hospital, please help me** . . .'"

104.    Once again, Lucas crawled out of his cell on his hands and knees:

---

[3] The grammar and spelling errors are in original.



105.    Neither Nurse Diaz nor Morales-Pliego ever assisted Lucas to help him stand up.

106.    Nurse Diaz charted that Lucas is "[a]ble to stand up, walk outside his cell sit up and sit still for vitals signs taking [sic]."[4]  This is a gross mischaracterization of Lucas's physical abilities.  Lucas could never stand fully erect, and instead walked to the table hunched over grasping at his stomach as depicted below:

---

[4] Grammatical errors in original.





107.    Once Lucas was at the table, he could not remain upright for a prolonged period of time, as reflected in the image below:



108.    Like Nurse Willis, Nurse Diaz failed to take Lucas's temperature.

109.    Lucas's vitals, when compared to those taken approximately 3 to 4 hours earlier, also suggested that he was at an elevated level of distress and were consistent with increasing infection.

110.    His pulse was elevated from 71 beats per minute to a 95 bpm.

111.    His blood pressure was elevated from 136/53 to 148/86, which is hypertensive.  Nurse Diaz did not note Lucas's hypertension in the medical records, return to recheck his blood pressure, or otherwise take any action because of this development.

112.    Once Nurse Diaz finished taking some of Lucas's vitals, Lucas collapsed to the ground as reflected in the image below.



113.    Nurse Willis took no action as a result of Lucas's increasingly concerning vital signs.

114.    Like Nurse Willis, Nurse Diaz failed to conduct a physical examination of Lucas's abdomen.

115.    Like Nurse Willis, Nurse Diaz ignored all of these concerning new symptoms and refused to send Lucas to the Emergency Department as ordered.

116.    About an hour later, Lucas requested to see a nurse again.

117.    Jail guard Abdirahman (first name unknown) wrote that Lucas "requested nurse complaining of burning stomach."

118.    Nurse Diaz and Morales-Pliego visited Lucas's cell at approximately 3:00 a.m. and were both able to observe that Lucas was in severe pain.

119.    Nurse Diaz's charted note of this incident reflects that she was accusing Lucas—who was dying at the time—of faking his pain: "After an hour requested to be seen by RN again.  Deputy walked to see him visually first.  No crying, patient resting.  Pt aware that a deputy was checking him.  **Started to whine.**" (emphasis added).

120.    Nurse Diaz and Morales-Pliego never even opened the cell for Lucas.

121.    Yet, Abdirahman[5] wrote in Lucas's inmate history that Lucas had stable vitals, writing: "Inmate received meds from nurse and has stable vitals.  Inmate will not get any meds for then night."  Nurse Diaz took no vitals during the 3:00 a.m. visit and the video confirms that.

122.    Instead, Nurse Diaz gave Lucas Maalox through the slot in the cell door.

123.    Once again, Nurse Diaz failed to investigate and ignored all of these concerning new symptoms and did not send Lucas to the Emergency Department in contravention of prior orders.

124.    Nurse Diaz failed to even put Lucas on a special watch to ensure that he was subjected to more frequent well-being checks.

---

[5] While it appears to be Morales-Pliego visiting Lucas with Nurse Diaz at 3:00 a.m., it is unclear why Abdirahman would have entered the notes of this visit into the Inmate History.

125.    As he closed Lucas back in his cell, Morales-Pliego observed that Lucas had collapsed back onto the floor into fetal position but simply walked away and left him on the floor in severe and obvious pain:



**C.    Nurse Omweri and Lucas Weatherspoon's deliberate indifference.**

126.    Nurse Omweri visited Lucas's cell at approximately 8:40 a.m. on July 21, 2022, for standard medication rounds with Jail guard Lucas Weatherspoon ("Weatherspoon").

127.    Lucas yet again crawled out of his cell in extreme pain on his hands and knees, as depicted below:



128.    Nurse Omweri did not chart her note regarding this visit until **after** Lucas died.

129.    Nurse Omweri charted that Lucas "was complaining off [sic] abdominal pains, he requested to get **all the medications he could**, he was kneeling on the floor and holding his abdomen…"

130.    Nurse Omweri knew from the Hennepin Healthcare records that Lucas was to return to the Emergency Department if he developed new or concerning symptoms.

131.    Nurse Omweri knew from the Hennepin Healthcare records that Lucas revealed at his initial intake that he swallowed a bag of drugs.

132.    Nurse Omweri knew from Nurse Diaz's charting that Lucas's blood pressure and pulse were elevating.

133.    Despite this, Nurse Omweri only gave Lucas the mild medications he had previously been prescribed at intake, i.e., before his symptoms worsened.

134.    Weatherspoon showed no concern for Lucas's well-being during this interaction; at times he could be seen smiling and laughing while interacting with other individuals as Lucas suffered on the floor:



135.    Nurse Omweri gave Lucas some Maalox, but Lucas was so weak and unsteady that he spilled much if not most of the dose on the floor as reflected in the image below:



136.    Thus, Nurse Omweri did not even ensure that Lucas received the full dose of the over-the-counter medication she was giving him to treat his serious and overt abdominal pain.

137.    Nurse Omweri then sternly directed Lucas back into his cell without doing anything to meaningfully address his obvious and severe medical issues and suffering:



138.    Lucas then returned to his cell doubled over, walking on all fours:



139.   Nurse Omweri charted that Lucas "walked back to his bed," leaving out that he did so with doubled over with his hands on the ground.

140.   Like the nurses and guards before them, neither Nurse Omweri nor Weatherspoon ever assisted Lucas to help him stand up.

141.   Like Nurse Willis, Nurse Omweri took no action as a result of Lucas's increasingly concerning vital signs.

142.   Like Nurses Willis and Diaz, Nurse Omweri failed to conduct a physical examination of Lucas's abdomen.

143.   Like Nurses Willis and Diaz, Nurse Omweri ignored all of these concerning new symptoms and refused to send Lucas to the Emergency Department as ordered.

144.   Nurse Omweri also failed to even put Lucas on a special watch to ensure that he was subjected to more frequent well-being checks.

145.   Weatherspoon then locked Lucas back into his cell, with the Maalox still sitting on the floor and partially visible from outside the cell:



146.    After this visit, despite personally observing Lucas's obviously serious medical condition, Weatherspoon conducted several well-being checks and either observed Lucas in serious pain or conducted the well-being check so poorly that he did not spend sufficient time to assess Lucas's state.

147.    Weatherspoon noted in Lucas's inmate history that Lucas refused Court and that Lucas declined to spend an hour out of his cell.

148.    Weatherspoon did nothing to get Lucas medical assistance throughout this suffering despite Lucas's obvious and horrific pain.

**IV.    Lucas dies from indifference and a perforated duodenum.**

149.    Surveillance footage captured Lucas in the final throes of his suffering just before 12:00 p.m., on July 21, 2022:





150. Weatherspoon found Lucas face down in his cell at approximately 12:30 p.m.

151. When Weatherspoon opened the door, the Maalox can still be seen on the ground in Lucas's cell.



152.    After initiating a Code 3, multiple first responders arrived on the scene and unsuccessfully attempted to resuscitate Lucas.

153.    Lucas was declared dead at 1:17 p.m.

154.    The Defendant Nurses, Weatherspoon, and others from the County and Hennepin Healthcare, left Lucas to die in a filthy cell:



155.  Lucas's cause of death was peritonitis due to a duodenal perforation.

156.  Put simply, Lucas died from an infection because there was a hole in his small intestine.

157.  This is an easily treatable problem when timely addressed, and Lucas would have lived if any of the Defendant Nurses, Weatherspoon, or others from the County or Hennepin Healthcare would have provided Lucas with timely and proper medical care rather than ignore his serious medical needs.

## Count I
### 42 U.S.C. § 1983
### Eighth and/or Fourteenth Amendment Violations
*Plaintiff v. All Individual Capacity Defendants*

158.   Plaintiff incorporates all allegations as if fully stated herein.

159.   Lucas suffered from serious medical needs.

160.   The Defendants named in this Count owed Lucas a duty to provide for Lucas's medical needs, safety, and general welfare.

161.   The Defendants named in this Count knew that Lucas had serious medical needs that created a high risk of harm, including death, if not properly assessed, addressed, and monitored.

162.   The Defendants named in this Count, under color of state law, acted with deliberate indifference to Lucas's serious medical needs in several manners, as detailed herein and as shall be set forth with additional discovery.

163.   Plaintiff alleges in the alternative that each of these Defendants knew that Lucas was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these constitutional violations, but failed to intervene either maliciously or with reckless disregard for whether Lucas's rights were violated.

164.   Any medical care that was provided by any of the individual Defendants, deviated so substantially from professional standards that it amounted to deliberate indifference.

165.    As a result, the Defendants named in this Count engaged in conduct that was in violation of the Eighth and/or Fourteenth Amendments to the United States Constitution.

166.    Lucas died as a direct and proximate result of the acts and omissions by the Defendants named in this Count.

167.    As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Lucas sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

168.    Punitive damages are available against the Defendants in this Count and are hereby claimed as a matter of federal common law.

169.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees.

170.    The conduct described herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

171.    As a direct and proximate result of these wrongful acts and omissions, Lucas's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**Count II**
**42 U.S.C. § 1983**
**Eighth and/or Fourteenth Amendment Violations**
*Plaintiff v. Hennepin County and Hennepin Healthcare*

172.    Plaintiff incorporates all allegations as if fully stated herein.

38

173.   Hennepin County and Hennepin Healthcare acted under color of state law.

174.   On, prior to, and after July 18, 2022, Hennepin County and Hennepin Healthcare and their final policymakers acted with deliberate indifference to the rights of Lucas and others when it tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the serious medical needs, safety, well-being, and welfare of inmates and/or detainees that presented with serious medical health concerns at the Jail.

175.   On and prior to July 18, 2022, Hennepin County and Hennepin Healthcare had notice of the constitutionally deficient medical care and unconstitutional customs and practices, yet with deliberate indifference to the rights of Lucas and others, provided constitutionally deficient medical care to Hennepin County Jail detainees and inmates.

176.   Examples of Hennepin County's unconstitutional customs include but are not limited to: failing to train staff to identify inmate's risk for suicidality at the Jail; failing to train staff to conduct proper well-being checks; and failing to discipline staff for failing to conduct proper well-being checks and lying about doing so.

177.   Examples of Hennepin Healthcare's unconstitutional customs include but are not limited to failing to train staff to work in a correctional setting and failing to identify an inmate's risk for severe illness and/or death at the Jail.

178.   The unconstitutional customs and practices were the moving force behind Lucas's death and the violation of his constitutional rights.

179.   The Defendants named in this Count are subject to liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and/or *City of Canton v. Harris*, 489 U.S. 378 (1989).

180.   Lucas's death was the direct and proximate result of acts and omissions by the Defendants named in this Count.

181.   As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Lucas sustained compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

182.   Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees.

183.   The conduct described herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

184.   As a direct and proximate result of these wrongful acts and omissions, Lucas's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**Count III**
**Wrongful Death Under Minnesota State Law**
*Plaintiff v. Hennepin County and Hennepin Healthcare*

185.   Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

186.   The individual Defendants and other employees of Hennepin Healthcare and Hennepin County owed Lucas a duty to provide for Lucas's well-being and safety.

187.    The Defendants named in this Count knew or should have known that Lucas was at a high risk of death, given his prior medical history and current medical condition.

188.    The individual Defendants and other employees of Hennepin Healthcare and Hennepin County deviated from the requisite ordinary and professional standards of care with respect to Lucas, as detailed herein and as shall be set forth with additional discovery.

189.    Some of these individual Defendants, including the Defendant Nurses, are classified as health care providers under Minnesota law.

190.    Plaintiff has supplied a declaration of expert review pursuant to Minnesota Statute § 145.682, subd. 4, attached to the initial Complaint as Exhibit A.

191.    Hennepin County and Hennepin Healthcare are directly liable for their operational failures as set forth herein.

192.    Hennepin County and Hennepin Healthcare are vicariously liable for the individual acts and omissions identified herein, including breach of ministerial duties, as those individuals were acting within the course and scope of their duties as Hennepin County and/or Hennepin Healthcare employees.

193.    The conduct herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

194.    These wrongful act and omissions directly and proximately caused Lucas's death.

195.    These wrongful acts and omissions caused Lucas to endure pain and suffering in addition to all other available categories of compensatory damages.

196.    As a direct and proximate result of these wrongful acts and omissions, Lucas's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**Plaintiff demands a trial by jury for issues of fact herein.**

## Prayer for Relief

WHEREFORE, Plaintiff Louis Bellamy, as Trustee for the next of kin of Lucas Bellamy, prays for judgment against Defendants as follows:

1.      As to Count I, a money judgment against the individual capacity defendants for compensatory, special, and punitive damages in an amount to be determined by a jury, together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in addition to compensatory damages for the next of kin in an amount to be determined by a jury.

2.      As to Count II, a money judgment against Hennepin County and Hennepin Healthcare for compensatory and special damages in an amount to be determined together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in addition to compensatory damages for the next of kin in an amount to be determined by jury.

3.      As to Count III, a money judgment against Hennepin County and Hennepin Healthcare for compensatory damages for the next of kin in an amount to be determined by jury, in addition to costs, disbursements, and prejudgment interest.

4.      For such other and further relief as this Court deems just and equitable, including but not limited to injunctive relief to correct the unconstitutional customs and practices of Hennepin County and Hennepin Healthcare.

**STORMS DWORAK LLC**

Dated: January 23, 2024                    /s/ Jeffrey S. Storms
                                           Jeffrey S. Storms, #387240
                                           Paul C. Dworak, #391070
                                           Ryan O. Vettleson, #312915
                                           Naomi E.H. Martin, #0402332
                                           222 South 9th Street, Suite 470
                                           Minneapolis, MN 55402
                                           Phone: 612.455.7055
                                           Fax: 612.455.7051
                                           jeff@newmarkstorms.com
                                           paul@newmarkstorms.com
                                           ryan@newmarkstorms.com
                                           naomi@newmarkstorms.com

                                           *and*

                                           Jill A. Oleisky, #278403
                                           OLEISKY & OLEISKY, P.A.
                                           10201 Wayzata Blvd, Suite 260
                                           Minnetonka, MN 55305
                                           Phone: #612-332-3100
                                           jill@oleisky.com