# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

---

Louis Bellamy, as Trustee for the
next of kin of Lucas John Bellamy,
Deceased,

               Plaintiff,

        vs.

Roselene M. Omweri in her individual capacity,
Kay P. Willis in her individual capacity,
Michelle D. Diaz in her individual capacity,
Lucas Weatherspoon in his individual capacity,
Hennepin Healthcare System, Inc., and
Hennepin County, Minnesota,

               Defendants.

Case No. 24-cv-00170 (DWF/TNL)

**First Amended Complaint**

**Jury Trial Demanded**

---

For his First Amended Complaint, Plaintiff Louis Bellamy as trustee for the next of kin of decedent Lucas John Bellamy ("Lucas"), by and through his attorneys, states and alleges upon knowledge, information, and belief as follows:

## Introduction

1.    Lucas spent the last day of his life detained at the Hennepin County Adult Detention Center (the "Jail"), desperately begging nurses and Jail guards to see a doctor. His pleas went ignored even though a Hennepin Healthcare provider had ordered that Lucas "[r]eturn to the ED [Emergency Department] for any new concerning symptoms." Lucas could not return himself to the Emergency Department because he was in Hennepin County's custody. Instead of receiving the medical treatment that was ordered

and that Lucas desperately needed, Hennepin Healthcare and County employees left Lucas to crawl around on the Jail floor like he was subhuman, like he was an animal, while he slowly and painfully died from the effects of a hole in his intestine. Lucas could have been easily saved with proper treatment. Instead, he endured a real-life nightmare and died on July 21, 2022.

2.     This is an action for damages pursuant to 42 U.S.C. § 1983 against the Defendants due to their deliberate indifference to Lucas's objectively serious medical needs, known by Defendants, with supplemental state law claims.

### Parties

3.     Lucas was at all relevant times a 41-year-old man residing in Minnesota. Like millions of Americans, Lucas suffered from drug addiction. Lucas was much more than his drug addiction. He was a father, a son, a brother, an actor, and a loved member of his community.

4.     Plaintiff Louis Bellamy ("Plaintiff") is Lucas' father and was appointed as the trustee for Lucas's next of kin on January 6, 2023, by the Honorable Kristin A. Siegesmund in Case No. 27-cv-22-18265 (Henn. Dist. Ct.). Plaintiff is the founder of the nationally renowned Penumbra Theatre in Saint Paul, Minnesota.

5.     Defendant Hennepin County, Minnesota (the "County") is a county within and a political subdivision of the State of Minnesota. It is a body politic and corporate subject to suit pursuant to Minn. Stat. § 373.01 *et seq.* The County is also defined as a municipality for purposes of tort liability pursuant to Minn. Stat. § 466.01 *et seq.* The County owns and operates the Hennepin County Sheriff's Office ("HCSO"), the Adult

Detention Center ("ADC"), and Defendant Hennepin Healthcare System, Inc. ("Hennepin Healthcare").

6.      At all relevant times, the County owed Lucas and other inmates at the Jail a nondelegable duty of care to ensure that they received legally sufficient medical care.

7.      Hennepin Healthcare is a Minnesota public subsidiary corporation authorized by statute, Minn. Stat. § 383B.901 *et seq.*, and located in Hennepin County, Minnesota.  It does business as Hennepin Healthcare and Hennepin County Medical Center ("HCMC").

8.      Hennepin Healthcare employs medical personnel and provides the services of those personnel to the Jail for the purposes of providing medical care to the Jail detainees.[1]

9.      All acts and omissions of Hennepin Healthcare are considered to be the acts and omissions of the County.

10.      Employees of the County and Hennepin Healthcare both work under color of state law for purposes of 42 U.S.C. § 1983.

11.      Hennepin Healthcare and the County, to the extent considered distinguishable entities, engaged in a joint venture and worked in concert with one another to provide medical care to detainees at the Jail.

---

[1] The terms "inmate" and "detainee" shall be used interchangeably and without distinction for the purposes of this First Amended Complaint.

12.     At all relevant times, Nurse Roselene Omweri ("Nurse Omweri") resided in Minnesota, was employed by Hennepin Healthcare, and acted under color of state law. She is sued in her individual capacity.

13.     At all relevant times, Nurse Kay Willis ("Nurse Willis") resided in Minnesota, was employed by Hennepin Healthcare, and acted under color of state law. She is sued in her individual capacity.

14.     At all relevant times, Nurse Michelle Diaz ("Nurse Diaz") resided in Minnesota, was employed by Hennepin Healthcare, and acted under color of state law. She is sued in her individual capacity.

15.     At all relevant times, Deputy Lucas Weatherspoon ("Weatherspoon") was a deputy in the HCSO, employed by the County, and acted under color of state law. He is sued in his individual capacity.

## Factual Background

### I.     Overview of relevant medical concepts

16.     Abdominal pain can have a wide variety of causes, several of which are life threatening.

17.     This is acknowledged by Hennepin Healthcare's own policies.  *See, e.g.,* Nursing Standing Orders, Policy No. 4020-2.12019.

18.     Some life-threatening causes indicated by abdominal pain include but are not limited to appendicitis, peptic ulcers, intestinal obstruction, abdominal aortic aneurysms, and gastrointestinal perforations.

19.     A gastrointestinal perforation occurs when a hole forms in the wall of any part of the gastrointestinal tract, including the stomach, small intestine, or large intestine.

20.     A duodenal perforation is a perforation of the first section of the small intestine, directly connected to the stomach.

21.     A duodenal perforation can be caused by a host of conditions, including but not limited to peptic ulcers, trauma, foreign bodies or objects, and inflammatory diseases.

22.     A bag of drugs is the type of foreign object that can cause a duodenal perforation.

23.     Such a perforation could be caused by the sharp edges of the bag, by the chemical injury from the release of substances in the bag, or by the blockage and pressure of the obstruction.

24.     When there is duodenal perforation, contents of the duodenum such as partially digested food, gastric acids, and digestive enzymes, leak into the sterile abdominal cavity (i.e., the peritoneal cavity).

25.     The leaking of such contents into the peritoneal cavity results in a condition known as peritonitis, which is an inflammation of the peritoneum—the membrane that lines the inside of your abdomen—caused by infection.

26.     If peritonitis is not promptly and effectively treated, the infection can spread from the initial site in the peritoneum into the bloodstream, resulting in sepsis.

27.     If not promptly and effectively treated, sepsis can result in death.

28.     A duodenal perforation is an objectively serious and dangerous condition that can result in death if it is not promptly and effectively treated.

29.     When a patient presents to a nurse with overt and severe pain localized to the abdomen, a thorough assessment of the patient must be performed to assess if a patient has one of these life-threatening illnesses.

30.     The standard of care for a nurse encountering a patient with overt and severe pain localized to the abdomen requires that the nurse obtain a detailed patient history, perform a physical examination focused on the abdominal region, take critical vital signs, and promptly communicate findings to the doctor or similar advanced practitioner.

31.     The basic elements for a nursing examination of the abdomen include: inspection of the abdomen to note any visible abnormalities; auscultation—to listen for bowel sounds or any unusual noises; percussion—to assess for abnormalities such as fluid accumulation or enlarged organs; and palpation—to check for tenderness, distension, or masses.

32.     As part of palpation, the standard of care requires the nurse to assess for rigidity and guarding of the nearby abdominal muscles.

33.     Rigidity is an involuntary stiffening of the abdominal muscles, which is typically a sign of peritonitis.

34.     Guarding is a contracting of the abdominal muscles upon touch, which serves as a protective mechanism to minimize movement over painful or inflamed areas of the abdomen.

35.     The standard of care also requires the nurse to assess for rebound tenderness, i.e., the pain exhibited upon releasing pressure applied to the abdomen.

6

36.     When more pain is exhibited when the pressure is released compared to when applied, this symptom is consistent with peritonitis.

37.     When a patient is exhibiting overt and severe pain localized to the abdomen, it is outside the standard of care for a nurse to require the patient to engage in unnecessary physical activity such as walking or crawling.

38.     Forcing a patient to walk or crawl can exacerbate numerous life-threatening abdominal conditions, such as appendicitis, intestinal obstruction, or gastrointestinal perforation.

39.     Among other things, forcing a patient with a duodenal perforation to crawl and walk unnecessarily: (a) increases the risk of expanding the perforation; (b) increases the risk of spreading infection; and (c) aggravates pain and discomfort.

40.     In addition to the physical examination, when a patient is exhibiting overt and severe pain localized to the abdomen, the nursing standard of care requires a nurse to record the following vitals: blood pressure, heart rate, respiratory rate, temperature, and oxygen saturation.

41.     When a patient is exhibiting overt and severe pain localized to the abdomen, taking only some of these vital signs (or even all of these vital signs) without a physical examination is not sufficient to meet even the most minimal threshold of the nursing standard of care, as a patient suffering from a life-threatening abdominal condition may not initially exhibit some or all of the concerning signs and symptoms.

42.     The following signs and symptoms are not consistent with drug or alcohol withdrawal: overt and severe pain localized to the abdomen, abdominal rigidity, abdominal guarding, and abdominal rebound tenderness.

43.     It is not consistent with drug or alcohol withdrawal for a patient to experience such overt and severe pain localized to the abdomen that renders the patient unable to stand fully erect.

44.     Pain associated with drug withdrawal is more diffuse; it is not overt and severe pain localized to the abdomen.

45.     Drug withdrawal is also known to be a potentially deadly condition that can cause a number of other deadly conditions, including bowel perforations.

46.     If a patient were believed to be experiencing overt and severe pain localized to the abdomen from drug withdrawals, the nursing standard of care still requires the workup described above, i.e., physical examination, complete taking of vitals, and communication with a doctor or similar advanced practitioner.

47.     If any doctor or similar advance practitioner acting within the standard of care were informed by a nurse that a patient were experiencing overt and severe pain localized to the abdomen, that provider would ensure that a complete physical examination and taking of vitals were performed to ensure that the patient were not suffering from a life-threatening abdominal condition, such as a perforated duodenum.

## II.     Lucas was ordered to return to the Emergency Department for ANY new concerning symptoms.

48.     Lucas was arrested in the early morning hours of July 18, 2022.

8

49.     He was brought to the Jail where he disclosed at intake that he had ingested a bag of drugs shortly before presenting to the Jail.

50.     Lucas was in the County's custody at all relevant times.

51.     The County's conduct in taking Lucas into its custody rendered Lucas unable to care for himself.

52.     The County presented Lucas to HCMC's Emergency Department ("ED") at approximately 5:53 a.m. (i.e., the "ED Visit").

53.     Hennepin Healthcare, the same entity which provides the healthcare at the Jail, provides the medical care at HCMC.

54.     Lucas denied to HCMC staff "any fevers, difficulty breathing, chest pain, abdominal pain, nausea, vomiting, diarrhea, diaphoresis, tremors, or other concerning symptoms."

55.     During the physical exam, HCMC staff noted that Lucas "appear[ed] comfortable, not toxic appearing.  Sitting comfortably in room."

56.     The examination of his abdomen raised no concerns: "[s]oft, non-distended.  No tenderness to palpation.  No rebound or guarding.  No CVA [costovertebral angle tenderness]."

57.     After monitoring Lucas for several hours, the providers at HCMC determined that Lucas "[a]ppeared clinically stable on presentation, vitals only concerning for mild tachycardia."

58.     Lucas was able to walk while standing up straight during the ED Visit.

59.     Lucas did not crawl around on the floor at any point during the ED Visit.

60.     Lucas did not subjectively express experiencing abdominal pain during the ED Visit.

61.     Lucas did not objectively exhibit abdominal pain during the ED Visit by holding his stomach, doubling over, or otherwise.

62.     Lucas did not vomit during the ED Visit.

63.     Lucas did not beg for medical help during the ED Visit.

64.     Lucas exhibited no symptoms consistent with overt and severe abdominal pain localized to his abdomen.

65.     Lucas did not attempt to fake injury or illness or otherwise attempt to mislead medical personnel during the ED Visit in order to avoid returning to the Jail.

66.     Physician's Assistant Cameron Svihla ("PA-C Svihla") charted that Lucas "was stable for discharge back to PD custody at this time as he will continue[ ] to be monitored at jail and has **very low risk** for any toxic effects from opioid medications at this point."  (Emphasis added).

67.     PA-C Svihla also charted that Lucas should "[r]eturn to the ED for **any** new concerning symptoms." (Emphasis added.)

68.     Defendants understood at all relevant times that the Jail and the HCMC ED are only several city blocks away from one another.

III.    **Lucas developed new concerning symptoms but no one from Hennepin Healthcare or the County returns him to the Emergency Department.**

69.     Nurse Kathryn Piha ("Nurse Piha") completed Lucas's intake screening upon his return to the Jail.

70.     Lucas disclosed his recent drug usage and history of drug addiction.

71.     Since Hennepin Healthcare provides the employees who staff both HCMC and the Jail, each of the nurses and other medical personnel at the Jail, including the individually named nurse defendants, had access to Lucas's medical records from the ED Visit.

72.     Jail medical personnel, including the individually named nurse defendants, knew that at the time of discharge from the ED Visit Lucas did not present with any concerning physical symptoms.

73.     Jail medical personnel, including the individually named nurse defendants, knew that Lucas was ordered to return to the ED "for any new concerning symptoms."

74.     Nurse Piha charted that Eric Hazen, M.D. ("Dr. Hazen") prescribed Vistaril, Zofran, and Imodium to treat Lucas's anticipated drug withdrawals.

75.     These are all mild medications and are not controlled substances.

76.     While Lucas did receive these mild medications, he never received more substantial withdrawal medication during his detention at the Jail.

77.     Despite prescribing Lucas these medications, there is no evidence from the medical records that Dr. Hazen ever personally met with or evaluated Lucas.

78.     At 6:22 p.m., Nurse Claire Riesgraf charted that Lucas requested Narcan at intake and met the criteria for Narcan distribution under Jail policy, but the Narcan was not dispensed.

79.     Hennepin Healthcare staff determined that absent the development of further withdrawal symptoms, no further withdrawal medication would be prescribed.

80.     The fact that more substantial withdrawal medications were not prescribed at that time reflects that Lucas was not presenting with concerning symptoms upon his booking at the Jail.

81.     Shortly after midnight on July 20, 2022, Lucas became ill and started vomiting in his general population bunk, as depicted below:



82.     Lucas was then moved from the general population into a protective custody unit with one inmate per cell.

83.     Jail staff did not record why they moved Lucas, but Jail staff later recorded that the move was "possibly due to bad [withdrawals]."

84.     There is no evidence that Lucas ever ate food again after his move to protective custody and prior to his death.

85.      Defendants knew that Lucas was declining his meals and, at times, other inmates were taking his food because he was not eating it.

86.     Defendants also knew Lucas declined taking the allotted one-hour to be out of his cell each time it was offered.

87.     On the evening of July 20, 2022, Lucas's condition worsened in a drastic and obvious fashion.

**A.    Nurse Willis was deliberately indifferent to Lucas's objectively serious and obvious medical needs.**

88.     Defendant Nurse Willis and Jail guard Taylor (first name unknown) met with Lucas at approximately 9:40 p.m.

89.     Nurse Willis's interaction with Lucas from approximately 9:40 p.m. until approximately 9:45 p.m. is reflected in the video clip attached as Exhibit A.

90.     At all relevant times, Nurse Willis had the medical knowledge set forth in Paragraphs 16 through 46 above.

91.     Nurse Willis knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas revealed at his initial intake that he had swallowed a bag of drugs.

92.     Nurse Willis knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas physically presented at HCMC in a manner consistent with Paragraphs 54 through 66 above.

93.     Nurse Willis knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas was to return to the ED if he developed "**any** new concerning symptoms." (Emphasis added.)

94.     Nurse Willis' charting of this interaction is set forth as follows:

---

**Progress Notes by Willis, Kay P, RN at 7/20/2022 2149**

D: Pt c/o stomach pain

A: COWS = 8. Pt was sitting on the floor and mourning when this writer arrived. Pt reported was not able to eat. Stated " I need to go to the hospital, I need IV liquid". Able to sit up and sit still. Vitals WNL limit. BP 134/76 (Patient Position: Sitting) | Pulse 71 | SpO2 97%

R: Pt understands to contact medical staff if symptoms worsen.

P: Will order Maalox. Liquid diet x 24 hours with Gatorade per meal. Deputy staff stated they will try to get him some milk tonight. Will update SAND. Will report to next shift.

Willis, Kay P, RN, 7/20/2022 9:54 PM

Electronically signed by Willis, Kay P, RN at 7/20/2022 10:15 PM

---

95.     Lucas was in such severe and obvious pain that it took him 45 seconds to crawl out of his cell on his hands and knees after Taylor opened the cell door.

96.     Lucas crawled towards Nurse Willis and Taylor as depicted in the images below:

14





97.    Lucas was directed to sit at the table.

98.     Lucas was in so much pain that he could not even reach the table without collapsing face first onto the ground as depicted below:



99.     Neither Nurse Willis nor Taylor ever assisted Lucas to help him stand up.

100.    Nurse Willis further charted that Lucas informed her that he was not able to eat, and he also said, "I need to go to the hospital, I need IV liquid."

101.    Nurse Willis observed and learned during this interaction that Lucas could not stand because he was experiencing overt and severe pain localized to his abdomen.

102.    Taylor documented this visit as follows:

| 7/20/22  22:17 | MED | INMATE COMPLAINS OF STOMACH | Bellamy requested to go to the hospital do to stomach pains. Nurse staff was contacted. Nurse K arrived and took Bellamys vitals. Nurse K stated vitals were perfectly fine. Bellamy was given Malocks. Nurse K would be switching Bellamy to a liquid diet to help him eat. Bellamy had not been eating, even though he had accepted meals. Nurse K advised Bellamy to eat, that would aide his recovery during his withdraws. Nurse K advised Bellamy that the nursing staff is avalible 24 hours a day if needed help bu Nurse K was not sending Bellamy to the hospital tonight. | RATA001TAYLOR |

103.    Nurse Willis did not chart that Lucas had to crawl from his cell to the table for the examination, that he had laid face down on the floor in a ball, or that he could not sit upright for a prolonged period once he finally reached the table, as depicted below:



104.    Instead, Nurse Willis simply charted that Lucas was "[a]ble to sit up and sit still."

105.    Despite her medical training to the contrary, Nurse Willis watched as Lucas endured the unnecessary pain of crawling, pulling himself up, and walking.

106.    Nurse Willis never conducted a physical examination of Lucas's abdomen.

107.    Nurse Willis did not conduct a complete set of vitals, failing to take his temperature or respiratory rate.

108.    Of the vitals Nurse Willis did take, she recorded a blood pressure of 134/76, which was approaching hypertension.

109.    Taylor noted that Nurse Willis informed Lucas that she "was not sending [him] to the hospital tonight."

110.    Nurse Willis did not document that she told Lucas that she "was not sending [him] to the hospital tonight."

111.    Nurse Willis instructed Lucas to contact Jail medical staff if his symptoms worsened.

112.    When Nurse Willis sent Lucas back to his cell, Lucas could not stand fully erect and continued to hold his stomach while he walked in a hunched over manner.

113.    Nurse Willis knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas did not have this abdominal pain during his visit to the HCMC ED.

114.    The symptoms Nurse Willis observed were new.

115.    The symptoms Nurse Willis observed were concerning.

116.    Given Lucas's medical history and severe pain, Lucas's new concerning symptoms were obvious and serious.

117.    Any layperson observing Lucas at the times when Nurse Willis did would easily recognize Lucas's need for a doctor's attention.

118.    Despite Lucas developing these new and objectively serious symptoms, Nurse Willis ignored the order that Lucas be returned to the ED and refused to send Lucas to the ED as ordered.

119.    Nurse Willis never informed a doctor or other advanced practitioner of Lucas's condition.

120.    Lucas's physical condition was consistent with the abdominal pain he was experiencing from his duodenal perforation that would have been suspected by a differential diagnosis upon a physical examination within the standard of care.

121.    Nurse Willis returned to re-check Lucas's blood pressure at approximately 10:06 p.m.

122.    Nurse Willis's interaction with Lucas from approximately 10:06 p.m. until approximately 10:09 p.m. is reflected in the video clip attached as Exhibit B.

123.    Nurse Willis charted this visit with Lucas as follows:

Rechecked Pt . Pt was sleeping when this writer not in field of vision. Pt started mourning when asked to stand up. BP (standing) 136/53. Pt was educated to stay hydrated. Will not order clonidine at this time. Will report to oncoming shift.

Willis, Kay P, RN, 7/20/2022 10:14 PM

Electronically signed by Willis, Kay P, RN at 7/20/2022 10:15 PM

124.    Nurse Willis observed that Lucas was too weak to stand on his own to have his blood pressure measured but did not chart it.

125.    Nurse Willis observed that Lucas was still experiencing overt and severe pain localized to his abdomen but did not chart it.

19

126.    Images of Lucas struggling to stand during this interaction are reflected

below:





127.     Lucas's blood pressure this time read 136/53, and Willis charted that she would not "order clonidine at this time."

128.     Clonidine is an antihypertensive drug that lowers blood pressure.

129.     Nurse Willis did nothing other than take Lucas's blood pressure during this visit.

130.     Nurse Willis failed to even put Lucas on a special watch to ensure that he was subjected to more frequent well-being checks.

131.     Nurse Willis ignored the obvious pain he was in.

132.     Once again, Nurse Willis refused to send Lucas to the ED for his new concerning symptoms as ordered.

133.     Nurse Willis knew Lucas needed a doctor's attention and disregarded his serious medical needs.

134.     Nurse Willis did nothing to address Lucas's objectively serious medical needs.

**B.     Nurse Diaz was deliberately indifferent to Lucas's objectively serious and obvious medical needs.**

135.     At approximately 1:30 a.m. on July 21, 2022, Lucas used the intercom to contact Jail guard Morales-Pliego (first name unknown).

136.     Morales-Pliego documented this visit as follows:

| 7/21/22 | 2:03 | MED | BAD STOMACHACHE | Inmate communicated me via intercom that he was having a really bad stomachache he screamed "help me, help me" i went to check on him and hi was lying on the floor fetus position, i asked how he was feeling and bellamy stated "my stomach hurts really bad, help me" i called the med room and nurse Michelle come to check on Bellamy, she tooks his vitals, bellamy vitals were ok, nurse Michelle gave Bellamy medication to helo him with his withdrawals. romo002 | ROMO0002 | MORALES-PLIEGO |

137.    Nurse Diaz then joined Morales-Pliego on a visit to Lucas's cell.

138.    Nurse Diaz's interaction with Lucas from approximately 1:40 a.m. until approximately 1:46 a.m. is reflected in the video clip attached as Exhibit C.

139.    At all relevant times, Nurse Diaz had the medical knowledge set forth in Paragraphs 16 through 46 above.

140.    Nurse Diaz knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas revealed at his initial intake that he swallowed a bag of drugs.

141.    Nurse Diaz knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas physically presented at HCMC in a manner consistent with Paragraphs 54 through 66 above.

142.    Nurse Diaz knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas was to return to the ED if he developed "any new concerning symptoms."

143.    Like Morales-Pliego, Nurse Diaz observed that Lucas had overt and severe pain localized to his abdomen, as reflected in her chart note of this encounter:

**Progress Notes by Diaz, Michelle D, RN at 7/21/2022 0542**

PATIENT complained of stomach pain & nauseous.
Pt was kneeling while his head is on the floor and crying when checked. Pt verbalized " I need to go to the hospital, please help me. Able to stand up, walk outside his cell sit up and sit still for vitals signs taking. Vitals: BP 148/86 (Patient Position: Sitting) | Pulse 95 | Resp 16 | SpO2 95%
PRN medications given: vistaril, Zofran, Imodium.
After an hour requested to be seen by RN again. Deputy walked to see him visually first. No crying, patient resting. Pt aware that a deputy was checking him. Started to whine.
prN Maalox given.
Will pass on information to next shift.

Electronically signed by Diaz, Michelle D, RN at 7/21/2022  5:51 AM

**Progress Notes by Willis, Kay P, RN at 7/20/2022 2212**

144.   Nurse Diaz observed Lucas crawl out of his cell on his hands and knees:



145.    Neither Nurse Diaz nor Morales-Pliego ever assisted Lucas to help him stand up.

146.    Nurse Diaz charted that Lucas is "[a]ble to stand up, walk outside his cell sit up and sit still for vital[] signs taking."

147.    Nurse Diaz's chart notes are a gross mischaracterization of Lucas's physical abilities as Lucas could never stand fully erect, and instead walked to the table hunched over grasping at his stomach as depicted below:





148.    Despite her medical training to the contrary, Nurse Diaz watched as Lucas endured the unnecessary pain of attempting to walk and pull himself up.

149.    Nurse Diaz observed that once Lucas was at the table, he could not remain upright for a prolonged period of time, as reflected in the image below:



150.    Nurse Diaz failed to take Lucas's temperature.

151.    Nurse Diaz failed to conduct a physical examination of Lucas's abdomen.

152.    Nurse Diaz charted that Lucas's pulse increased to 95 bpm.

153.    Nurse Diaz charted that Lucas's blood pressure was now 148/86, which was now indicative of Stage 1 hypertension.

154.    Nurse Diaz knew from that these vitals when compared to those recorded earlier by Nurse Willis earlier reflected that Lucas was at an elevated level of distress.

155.    Nurse Diaz knew from Lucas's medical history and increasing abdominal pain that Lucas's vitals were consistent with worsening infection and/or worsening medical conditions, several of which could be life threatening.

156.    Nurse Diaz did not note Lucas's hypertension in the medical records, return to recheck his blood pressure, or otherwise take any action because of this development.

157.    Once Nurse Diaz finished taking some of Lucas's vitals, Lucas collapsed to the ground as reflected in the image below:



158.    When Nurse Diaz sent Lucas back to his cell, Lucas could not stand fully erect and continued holding his stomach while he walked in a hunched over manner.

159.    The symptoms Nurse Diaz observed were new.

160.    The symptoms Nurse Diaz observed were concerning.

161.    Given Lucas's medical history and severe pain, Lucas's new concerning symptoms were obvious and serious.

162.   Any layperson observing Lucas at the times when Nurse Diaz did would easily recognize Lucas's need for a doctor's attention.

163.   Despite Lucas developing these new and objectively serious symptoms, Nurse Diaz ignored the order that Lucas be returned to the ED and refused to send Lucas to the ED as ordered.

164.   Nurse Diaz never informed a doctor or other advanced practitioner of Lucas's condition.

165.   Lucas's physical condition was consistent with the abdominal pain he was experiencing from his duodenal perforation that would have been suspected by a differential diagnosis upon a physical examination within the standard of care.

166.   Nurse Diaz left Lucas in agonizing pain with an obviously deteriorating and serious medical condition.

167.   About an hour later, Lucas requested to see a nurse again.

168.   Jail guard Abdirahman (first name unknown) documented that:

| 7/21/22 | 3:49 | BEHA | STOMACH PAIN | Inmate requested nurse complaining of burning stomach. Inmate recieved meds from nurse and has stable vitals. Inmate will not get any meds for the night. KAAB002 | KAAB002ABDIRAHMAN |

169.   Nurse Diaz and Morales-Pliego[2]  visited Lucas's cell at approximately 3:00 a.m. and both observed Lucas in severe pain.

---

[2] It appears to again be Morales-Pliego visiting Lucas with Nurse Diaz at 3:00 a.m., so it is unclear as to why Abdirahman entered the notes of this visit into the Inmate History.

170. Nurse Diaz's interaction with Lucas from approximately 3:02 a.m. until approximately 3:03 a.m. is reflected in the video clip attached as Exhibit D.

171. Nurse Diaz's chart note of this incident reflects that she was accusing Lucas—who was dying at the time—of faking his pain.

172. Nurse Diaz documented in her chart note, which was combined with her prior visit: "After an hour requested to be seen by RN again. Deputy walked to see him visually first. No crying, patient resting. Pt aware that a deputy was checking him. **Started to whine.**" (Emphasis added).

173. Nurse Diaz and Morales-Pliego never even opened the cell to assess Lucas's physical state.

174. It is unclear why Abdirahman documented that Lucas had "stable vitals," since no vitals were taken during this visit.

175. Nurse Diaz took no vitals during the 3:00 a.m. visit, despite that fact that Lucas's vitals were worsening.

176. Instead, Nurse Diaz gave Lucas Maalox, generally used to treat heartburn, through the slot in the cell door.

177. Once again, Nurse Diaz failed to investigate all of Lucas's concerning new symptoms.

178. Nurse Diaz again ignored all of Lucas's concerning new symptoms.

179. Nurse Diaz again did not send Lucas to the ED, which was in contravention of medical orders.

180.   Nurse Diaz failed to even put Lucas on a special watch to ensure that he was subjected to more frequent well-being checks.

181.   Nurse Diaz knew Lucas needed a doctor's attention and disregarded his serious medical needs.

182.   Nurse Diaz did nothing to address Lucas's objectively serious medical needs.

**C.   Nurse Omweri was deliberately indifferent to Lucas's objectively serious and obvious medical needs.**

183.   Nurse Omweri visited Lucas's cell at approximately 8:40 a.m. on July 21, 2022, for standard medication rounds with Jail guard Weatherspoon.

184.   Nurse Omweri's interaction with Lucas from approximately 8:41 a.m. until approximately 8:45 a.m. is reflected in the video clip attached as Exhibit E.  A twelve-second clip was redacted from this clip to protect the privacy of a different inmate.

185.   At all relevant times, Nurse Omweri had the medical knowledge set forth in Paragraphs 16 through 46 above.

186.   Nurse Omweri knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas revealed at his initial intake that he swallowed a bag of drugs.

187.   Nurse Omweri knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas physically presented at HCMC in a manner consistent with Paragraphs 54 through 66 above.

188.    Nurse Omweri knew from the Hennepin Healthcare and/or County administrative and/or medical records that Lucas was to return to the ED if he developed "any new concerning symptoms."

189.    Nurse Omweri observed Lucas again crawl out of his cell in extreme pain on his hands and knees, as depicted below:



190.    Nurse Omweri charted her note **after** Lucas died, which states as follows:

**Progress Notes by Omweri, Roselene, RN at 7/21/2022 1429**

Patient was seen on med rounds this morning and he was complaining off abdominal pains, he requested to get all the medications he could, he was kneeling on the floor and holding his abdomen, he said his was going through withdrawals,he asked to get ma lox and something for nausea which was *given, he* also requested for tylenol that was given per policy. COWS were done and the score was 10.Patient then walked back to his bed. Called the nurse in charge off the subtext to have patient seen by the subutex provider to have him start the subutex, Patient was on already on the list to see provider today and there was a plan for him to be seen.

Electronically signed by Omweri, Roselene, RN at 7/21/2022  3:34 PM

191.    Nurse Omweri knew from Nurse Willis's and Nurse Diaz's charting that Lucas's blood pressure and pulse were elevating.

192.    Despite this, Nurse Omweri charted no vital signs pertaining to her visit with Lucas.

193.    The video evidence reflects that at most, Nurse Omweri took Lucas's pulse and oxygen saturation.

194.    Nurse Omweri did not take Lucas's blood pressure, respiratory rate, or temperature.

195.    More likely than not, one or more of Lucas's vital signs had worsened since the prior visit with Nurse Diaz.

196.    Despite Lucas's worsening condition, Nurse Omweri only gave Lucas the mild medications he had previously been prescribed at intake, *i.e.*, before his symptoms worsened.

197.    Nurse Omweri gave Lucas some Maalox, but Lucas was so weak and unsteady that he spilled much, if not most, of the dose on the floor as reflected in the image below:



198.    Nurse Omweri and Weatherspoon observed Lucas spill the Maalox on the

floor.

199.    Thus, Nurse Omweri did not even ensure that Lucas received the full dose

of the over-the-counter medication she was giving him to treat his serious and overt

abdominal pain.

200.    Nurse Omweri then sternly directed Lucas back into his cell without doing

anything to meaningfully address his obvious and severe medical issues and suffering:



201.    Lucas then returned to his cell doubled over, walking on all fours:



202.    Nurse Omweri charted that Lucas "walked back to his bed," leaving out that he was unable to stand fully erect, and that he "walked" doubled over with his hands on the ground.

203.    Neither Nurse Omweri nor Weatherspoon ever assisted Lucas to help him stand up.

204.    The symptoms Nurse Omweri observed were new.

205.    The symptoms Nurse Omweri observed were concerning.

206.    Given Lucas's medical history and severe pain, Lucas's new concerning symptoms were obvious and serious.

207.    Any layperson observing Lucas at the times when Nurse Omweri did would easily recognize Lucas's need for a doctor's attention.

208.    Despite Lucas developing these new and objectively serious symptoms, Nurse Omweri ignored the order that Lucas be returned to the ED and refused to send Lucas to the ED as ordered.

209.    Nurse Omweri never informed a doctor or other advanced practitioner of Lucas's condition.

210.    Lucas's physical condition was consistent with the abdominal pain he was experiencing from his duodenal perforation that would have been suspected by a differential diagnosis upon a physical examination within the standard of care.

211.    Nurse Omweri left Lucas in agonizing pain with an obviously deteriorating and serious medical condition.

212.   Nurse Omweri took no action as a result of Lucas's increasingly concerning vital signs.

213.   Nurse Omweri failed to conduct a physical examination of Lucas's abdomen.

214.   Nurse Omweri ignored all of these new concerning and exacerbating symptoms and refused to send Lucas to the ED as ordered.

215.   Nurse Omweri also failed to put Lucas on a special watch to ensure that he was subjected to more frequent well-being checks.

216.   Nurse Omweri knew Lucas needed a doctor's attention and disregarded his serious medical needs.

217.   Nurse Omweri did nothing to address Lucas's objectively serious medical needs.

**D.   Weatherspoon was deliberately indifferent to Lucas's objectively serious and obvious medical needs.**

218.   When Weatherspoon visited Lucas with Nurse Omweri, Weatherspoon knew that Lucas had been suffering from severe abdominal pain throughout the night and into the morning.

219.   Weatherspoon observed Lucas as he crawled on the floor, unable to stand up.

220.   Weatherspoon showed no concern for Lucas's well-being during this interaction; at times he could be seen smiling and laughing while interacting with other individuals as Lucas suffered on the floor:

36



221.    Weatherspoon then locked Lucas back into his cell, with the Maalox still sitting on the floor and partially visible from outside the cell:



222.    Well-being checks must be completed with such sufficiency and diligence that the jail guard conducting the check confirms, among other things, that an inmate is alive and not in medical distress.

223.    Well-being checks must be completed slowly and deliberately enough to confirm that the inmate is alive and well, not just that there is a human body in the cell.

224.    After this visit and until approximately 12:00 p.m., despite personally observing Lucas's obvious and serious medical distress, Weatherspoon conducted several

well-being checks and either observed Lucas in serious pain or conducted the well-being check so poorly that he did not spend sufficient time to assess Lucas's state. *See* Exs. F through O, reflecting the poor quality of Weatherspoon's well-being checks, which were microscopic in duration.

225.   During these well-being checks conducted by Weatherspoon, Lucas's condition continued to worsen.

226.   Weatherspoon noted in Lucas's inmate history that Lucas refused to attend a court hearing and that Lucas declined to spend an hour out of his cell.

227.   Weatherspoon did nothing to report Lucas's worsening condition or get Lucas medical assistance throughout his suffering despite Lucas's obvious, horrific, and worsening pain.

228.   Any layperson observing Lucas at the times when Weatherspoon did would easily recognize Lucas's need for a doctor's attention.

229.   Weatherspoon knew Lucas needed a doctor's attention and disregarded his serious medical needs.

## III.   Lucas dies from indifference and a perforated duodenum.

230.   Surveillance footage captured Lucas in the final throes of his suffering just before 12:00 p.m., on July 21, 2022:[3]

---

[3] See also Exhibit P.





231.    Weatherspoon conducted his penultimate well-being check from 12:19:06

p.m. until 12:19:16 pm.  *See* Ex. Q.  This video is cropped to protect the identity of a

different inmate, which impacted the display of the time banner.

232.    Weatherspoon clearly observes something concerning in Lucas's cell

because he then returns again from 12:19:30 p.m. until 12:19:47 p.m., yet he still does not

open the cell to check on Lucas.  *See* Ex. R.  This video is cropped to protect the identity

of a different inmate, which impacted the display of the time banner.

233.    Weatherspoon returned and found Lucas face down in his cell at

approximately 12:39 p.m., when he finally opened the door to the cell to check on Lucas.

234.    When Weatherspoon opened the door, the Maalox can still be seen on the

ground in Lucas's cell:



235.   After initiating a Code 3, multiple first responders arrived on the scene and unsuccessfully attempted to resuscitate Lucas.

236.   Lucas was declared dead at 1:17 p.m.

237.   The Defendant Nurses, Weatherspoon, and others from the County and Hennepin Healthcare, left Lucas to die in a filthy cell:



238.   Lucas's cause of death was peritonitis due to a duodenal perforation.

239.   Put simply, Lucas died from an infection because there was a hole in his small intestine.

240.    Defendants' delay in providing necessary medical treatment to Lucas caused Lucas's death.

241.    Lucas would have lived if any of the Defendant Nurses, Weatherspoon, or others from the County or Hennepin Healthcare would have provided Lucas with timely and proper medical care rather than ignore his objectively serious and obvious medical needs.

**Count I**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violations**
*Plaintiff v. All Individual Capacity Defendants*

242.    Plaintiff incorporates all allegations as if fully stated herein.

243.    Lucas suffered from obvious and objectively serious medical needs.

244.    The Defendants named in this Count owed Lucas a duty to provide for Lucas's medical needs, safety, and general welfare.

245.    The Defendants named in this Count knew that Lucas had obvious and objectively serious medical needs that created a high risk of harm, including death, if not properly assessed, addressed, and monitored.

246.    Any layperson observing Lucas at the times when each of these individual defendants did would easily recognize Lucas's obvious need for a doctor's attention.

247.    The Defendants named in this Count, under color of state law, acted with deliberate indifference to Lucas's serious medical needs in several ways, as detailed herein and as shall be set forth with additional discovery.

248.   Defendants' deliberate indifference to Lucas's obvious and serious medical needs violated his Fourteenth Amendment right to receive adequate medical care.

249.   Plaintiff alleges in the alternative that each of these Defendants knew that Lucas was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these constitutional violations, but failed to intervene either maliciously or with reckless disregard for whether Lucas's rights were violated.

250.   Any medical care that was provided by any of the individual Defendants deviated so substantially from professional standards that it amounted to deliberate indifference.

251.   The inadequate medical care that was provided to Lucas was conducted in such a way that exacerbated Lucas's condition by forcing him to hobble or crawl to the table to take his vital signs, which were routinely incomplete.

252.   As a result, the Defendants named in this Count engaged in conduct that was in violation of the Fourteenth Amendment to the United States Constitution.

253.   Lucas died as a direct and proximate result of the acts and omissions by the Defendants named in this Count.

254.   As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Lucas sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

255.   The compensatory damages include but are not limited to pain and suffering and loss of enjoyment of life.

256.     Punitive damages are available against the Defendants in this Count and are hereby claimed as a matter of federal common law.

257.     Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees.

258.     The conduct described herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

259.     As a direct and proximate result of these wrongful acts and omissions, Lucas's next of kin have suffered pecuniary losses, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**<u>Count II</u>**
**Wrongful Death Under Minnesota State Law**
*Plaintiff v. Hennepin County and Hennepin Healthcare*

260.     Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

261.     The individual Defendants and other employees of Hennepin Healthcare and the County owed Lucas a duty to provide for Lucas's well-being and safety and to provide care in accordance with applicable professional standards of care.

262.     The Defendants named in this Count knew or should have known that Lucas was at a high risk of death, given his prior medical history and then-current obvious medical condition.

263.     The individual Defendants and other employees of Hennepin Healthcare and the County deviated from the requisite ordinary and professional standards of care

46

with respect to Lucas, as detailed herein and as shall be set forth with additional discovery.

264.    Some of these individual Defendants, including the Defendant Nurses, are classified as health care providers under Minnesota law.

265.    Plaintiff supplies a declaration of expert review pursuant to Minnesota Statute § 145.682, subd. 4, attached as Exhibit S.

266.    The County and Hennepin Healthcare are directly liable for their operational failures as set forth herein.

267.    The County and Hennepin Healthcare are vicariously liable for the individual acts and omissions identified herein, including breach of ministerial duties, as those individuals were acting within the course and scope of their duties as Hennepin County and/or Hennepin Healthcare employees.

268.    The conduct herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

269.    These wrongful act and omissions directly and proximately caused Lucas's death.

270.    These wrongful acts and omissions caused Lucas to endure pain and suffering in addition to all other available categories of compensatory damages.

271.    As a direct and proximate result of these wrongful acts and omissions, Lucas's next of kin have suffered pecuniary losses, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

## Count III
### Injury Action Under Minnesota State Law, Minn. Stat. § 573.02, subd. 2
*Plaintiff v. Hennepin County and Hennepin Healthcare*

272.    Plaintiff realleges all preceding paragraphs as if fully set forth herein.

273.    Alternatively, should a jury conclude that the acts and omissions described herein by County and Hennepin Healthcare employees did not cause Lucas's death, Defendants Hennepin County and Hennepin Healthcare are still liable for the damages caused by the negligent acts and omissions that injured Lucas but did not cause his death.

274.    The County and Hennepin Healthcare are directly liable for their operational failures as set forth herein.

275.    The County and Hennepin Healthcare are vicariously liable for the individual acts and omissions identified herein, including breach of ministerial duties, as those individuals were acting within the course and scope of their duties as County and/or Hennepin Healthcare employees.

276.    The County and Hennepin Healthcare's direct and vicarious acts and omissions directly and proximately caused Lucas to endure conscious pain, suffering, emotional distress, and loss of enjoyment of life prior to his death.  The wrongful acts of these defendants also would have directly and proximately caused Lucas to endure future pain, suffering, emotional distress, and loss of enjoyment of life had he continued to live.

**Plaintiff demands a trial by jury for issues of fact herein.**

### Prayer for Relief

WHEREFORE, Plaintiff Louis Bellamy, as Trustee for the next of kin of Lucas Bellamy, prays for judgment against Defendants as follows:

1.      As to Count I, a money judgment against the individual capacity Defendants for compensatory, special, and punitive damages in an amount to be determined by a jury, together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in addition to compensatory damages for the next of kin in an amount to be determined by a jury.

2.      As to Count II, a money judgment against Hennepin County and Hennepin Healthcare for compensatory damages for the next of kin in an amount to be determined by a jury, in addition to costs, disbursements, and prejudgment interest.

3.      As to Count III, a money judgment against Hennepin County and Hennepin Healthcare for compensatory damages in an amount to be determined by a jury, in addition to costs, disbursements, and prejudgment interest.

4.      For such other and further relief as this Court deems just and equitable, including but not limited to injunctive relief.

**STORMS DWORAK LLC**

Dated: May 10, 2024                /s/ Jeffrey S. Storms
                                   Jeffrey S. Storms, #387240
                                   Paul C. Dworak, #391070
                                   Ryan O. Vettleson, #312915
                                   Naomi E. H. Martin, #0402332
                                   Joseph T. Heegaard, #0401544
                                   222 South 9th Street, Suite 470
                                   Minneapolis, MN 55402
                                   Phone: 612.455.7055
                                   Fax: 612.455.7051
                                   jeff@stormsdworak.com
                                   paul@stormsdworak.com
                                   ryan@stormsdworak.com
                                   naomi@stormsdworak.com
                                   joe@stormsdworak.com

*and*

Jill A. Oleisky, #278403
OLEISKY & OLEISKY, P.A.
10201 Wayzata Blvd, Suite 260
Minnetonka, MN 55305
Phone: 612-332-3100
jill@oleisky.com